Argued and submitted June 26, affirmed November 28, 2007

In the Matter of A. R. S.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

V. G. B. R.,
*Appellant.*

Lincoln County Circuit Court
048252J

Petition Number 058282
A134740

172 P3d 286

Inge D. Wells argued the cause for appellant. With her on the brief was Wells & Wells.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

Father appeals from a judgment terminating his parental rights. The child at issue was 27 months old at the time of the termination trial and has been in foster care since he was two months old; mother relinquished her parental rights and only father's rights were at issue at trial. The family's involvement with the Department of Human Services (DHS) was precipitated by reports of domestic violence and neglect and, during the pendency of the case, father did participate in services aiming to address those issues. However, reviewing *de novo* and giving considerable weight to the juvenile court's credibility findings, ORS 419A.200(6); *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990), we affirm the judgment of termination.

In reviewing the facts, we begin with background information about father and about DHS's initial involvement with the family. We then examine chronologically the services that father was provided—alcohol treatment, psychological evaluations, and domestic violence prevention education—and his conduct after participating in those services. We then turn to the parenting training provided to father during visits and child's condition from the time he entered foster care through trial.

Father is from Mexico and is married to a woman there, with whom he has three adult children. Father's wife was the primary caregiver for their children, and father viewed his role primarily as that of provider. Father began a relationship with mother in 2002, and child was born in July 2004. Two-and-one-half-months later, in October 2004, child entered foster care. Mother eventually relinquished her parental rights, and the trial regarding termination of father's parental rights was held in November 2006.

Shortly after child was born, DHS received a report that mother was not bonding with child and had been completely unprepared for his birth; the agency also was concerned because mother had lost custody of her older children. DHS provided mother with an in-home visiting nurse, made referrals for services, and provided needed items such as blankets and a car seat.

When child was two months old and living with mother in transitional housing, DHS investigated a report that he was being neglected. Mother indicated that father hit and yelled at her and would yell at her when child cried; that, while she was pregnant, father pushed her and punched her in the stomach; and that, shortly after child's birth, father slapped her in the face while she was holding child. Mother reported feeling depressed, frustrated, and unable to cope with child, so DHS offered—and mother accepted—respite care for child. A psychological evaluation of mother conducted that same month indicated mild mental retardation, depression, anxiety, post-traumatic stress disorder, and passive-aggressive and dependent personality features. The evaluator opined that mother was incapable of meeting child's needs and, indeed, questioned whether she was capable of meeting even her own personal needs.

Soon thereafter, father and mother participated in a family decision meeting with DHS. Father admitted to frequent, heavy drinking and, despite his history of domestic violence, mother was unwilling to commit to preventing contact between child and father. DHS then took child into protective custody, explaining that child could not be returned until father addressed his propensity towards domestic violence. Father and mother lived together for two more months, until mother reported to a DHS caseworker that father had bitten her in the face. DHS helped mother move to a shelter for battered women—but she soon was required to leave for violating the shelter's policy against disclosing its location when father picked her up near the shelter.

In December 2004, the court assumed jurisdiction over child. Among other things, the court ordered father to complete a drug and alcohol evaluation, a psychological evaluation, and a domestic violence intervention program, and to participate in parenting coaching. Father has not had any formal education, does not speak English, and cannot read in Spanish or English. Accordingly, DHS supplied father with interpreters, Spanish-speaking service providers, and culturally appropriate treatment programs.

Father began alcohol treatment around the time the court assumed jurisdiction. He completed treatment in April

2005 and has maintained sobriety since that time. Indeed, at the time of trial, DHS had no concerns about father using alcohol.

During the same month that father began alcohol treatment, he underwent a psychological evaluation with Dr. Torres on a referral from DHS. Torres did not diagnose father with a mental or emotional illness other than alcohol abuse. Torres concluded that father's problems were social rather than clinical—specifically, acculturation problems and relational problems with his partner, including physical abuse. Although father displayed good abstract thinking ability, his thinking style was rigid and his social judgment poor. He exhibited low normal intelligence and lacked insight. In Torres's view, father was "aware of only his son's basic needs"; father could not "articulate the kind of child discipline he plan[ned] to use."

Shortly after that evaluation, father began a domestic violence education program (as opposed to therapy) at Crossroads. Between January 2005 and March 2006, he attended 41 Crossroads classes. Father was required to take five extra classes because of a domestic violence incident with mother and voluntarily sat in on two additional classes. Father testified that, after completing the program, he "understood that [he] had to learn the laws that are here." He also testified to the belief that his problems with violence ended after he attained sobriety and completed the Crossroads program.

In January 2006, while father was still participating in the Crossroads program, the juvenile court found that father might become minimally adequate to parent within 90 days. The court noted that he had made significant efforts by completing residential alcohol treatment and maintaining sobriety. The court observed that father had seven or eight classes left to complete in the Crossroads program, but expressed concern about his progress in addressing domestic violence:

> "The primary difficulty father faces, at this juncture, is that he seems unable to admit that he has been abusive towards [mother] in the past in spite of significant evidence to the contrary. * * * It has been suggested by [the director of

Crossroads] that his lack of candor will make it difficult for him to benefit from treatment.

"[Father's] intention to reunify with mother is another aspect of this same problem. Whereas it can be assumed that father would be more volatile and impulsive when drinking, it cannot be said that abstinence would assure more peaceful behavior. This is especially true if father considers physical abuse to be a valid dispute resolution method."

The court explained that, in order to become a minimally adequate parent, father needed to demonstrate, among other things, an understanding of the negative effects of domestic violence on child, the behavioral skills to avoid violence, and the capacity to recognize whether another adult could safely supervise or parent child.

In March 2006, the same month that father completed the Crossroads program, his attorney referred him for a psychological evaluation with Dr. Gonzalez. Like Torres, Gonzalez determined that father did not suffer from any emotional or mental illness but that his nonverbal intelligence and his ability to reason and solve problems were very poor. Gonzalez's evaluation raised concerns about father's ability to bond with child; testing indicated that father did not feel emotionally close to child or felt unable to accurately observe and understand child's feelings and needs. Nevertheless, Gonzalez was hopeful that father could become an appropriate parent if he obtained hands-on parenting training, established nonviolent relationships, and maintained a stable living environment.

At about the same time that father completed the Crossroads program and was evaluated by Gonzalez, he moved into the apartment building where mother was residing. However, father testified at a permanency hearing the following month that he and mother were just friends and saw each other only occasionally. Father testified that he was trying to get custody by himself rather than reunite with mother yet also indicated that it would be all right for them to raise child together if they were allowed to be together.

Later that same month (April 2006), father engaged in violence against mother and a man who intervened

between mother and father. At the beginning of that incident, father blocked mother's way, shoved her, and locked the door to her apartment to prevent her from leaving. Mother managed to leave, but father pursued her to the home of her friend, Kutsch. Although mother did not want to speak with father, he refused to leave and, in the course of the incident, head-butted Kutsch's boyfriend. Father was charged with harassment and fourth-degree assault as a result of the incident and, about two months before trial, was arrested on a warrant arising from those charges.

The April 2006 incident was the only time in the year and a half before trial that father physically assaulted mother. However, he engaged in other aggressive and possibly criminal behavior toward her during that time period. Once after mother had given Kutsch a ride, father became upset and tore the ignition out of the car that he allowed her to use. He entered her apartment against her wishes, including four or five occasions when he used a key (which mother had given him and then asked him to return) to enter her apartment. On another occasion in September or October 2006, shortly before trial, when mother refused to let father into her apartment, he crawled across the roof to break in through a window, purportedly so that he could discuss child.

In October 2006, Gonzalez conducted a follow-up psychological evaluation of father, again on a referral from father's attorney. She opined that father was not minimally able to parent in light of his continued contact with and aggressive behavior toward mother and his failure to make plans (despite DHS requests) regarding how to care for child during working hours. According to the evaluation, father denied that he had been provided the hands-on parenting training recommended in Gonzalez's initial evaluation—but in fact, father had received such training, as discussed below. Gonzalez indicated at trial that she had nothing else to recommend if father did not demonstrate sufficient parenting skills after hands-on parenting training. As she explained, if father "is not able to establish healthier and nonviolent relationships with others, if he's not able to demonstrate after hands-on training that he can provide care giving skills[,] then he is not able to parent if he's not able to follow through with that."

About a week before trial, father moved into a larger apartment, still in the same building as mother's apartment. He indicated that the move was motivated by a desire to obtain more space for child.

As noted, during the period that father was participating in the other services described above, he also received parenting training during regular visits with child. Father initially had one visit a week, which later was increased to two two-hour visits per week. Father consistently visited, brought snacks for child, and did not display anger or aggression during visits. Father and child generally played well together, although father sometimes appeared distracted or bored during visits.

As for training, father was given an opportunity to meet with child's foster parents to discuss child's routine. A parenting coach, Sly, provided hands-on services during visits in two service periods: April through September 2005 and May through July 2006. In December 2005, Haines became the supervisor for the visits, and she too tried to teach father parenting skills. Haines also worked with father to help him follow recommendations made by Sly. Haines explained that the focus in parenting training was for father to interact with child and that the language in which father communicated with child was not an issue.

Despite these efforts, however, father's interactions with child raised ongoing concerns about his ability to maintain child's safety. Haines observed that "keeping [child] safe in his environment has been a struggle during visits." For example, father tried to keep child in a crib after child became too large and active for it, resulting in child bumping his head a couple of times; because father did not respond to redirecting on that issue, DHS finally had to make a rule that father was not allowed to place child in the crib. Father also frequently allowed child to play with age-inappropriate toys that presented a choking hazard.

When Sly worked with father for the second time, some of her concerns remained the same and some changed. When working with father in 2005, Sly had observed many occasions when father did not respond to child. When she resumed working with father, she again had to address eye

contact and face-to-face interactions with child. Although Sly did not "observe any direct safety concerns from [her] perspective" during her second period of working with father, she grew more concerned about a lack of attachment between father and child and about some of father's responses when child was distressed or injured. Sly also was concerned about father's ability to meet child's changing needs, such as teaching "how to deal with strong feelings, how to socially problem-solve with others."

Meanwhile, Haines, unlike Sly, observed that father continued to have problems maintaining child's physical safety that were not resolving over time. On average, she had to redirect father twice per visit on physical safety issues concerning child. Haines observed that, as child began walking, father had a harder time keeping up with him.

Overall, father's progress in developing parenting skills was limited. Haines did not think that father would benefit from additional parenting classes, because "he hasn't really put to use what's been taught already, such as not [to] let your child run around with the pencil, or, you know, eat little tiny Legos. That kind of thing is still a concern, and we've addressed those things in the past." On a related note, Sly observed that father could be trained to address some situations but had problems generalizing that information. Sly was concerned that "kids are constantly developing and changing—so you can talk about what a toddler needs, but they turn into three-year-olds and four-year-olds very quickly. And * * * there's more and more demands." Although father made some improvement in the highly structured environment of supervised visits, Sly had continuing concerns about his ability to meet child's developing needs and did not think that father had progressed enough to handle even visits with less supervision.

In father's view, his visits with child are getting better and the bond between them is strong. Other witnesses, however, observed that, although father and child love each other, child does not exhibit a strong bond to father. When child sees father at visits, he reacts much as he reacts to seeing anyone else. Child is happy to see father but is equally happy to play with the interpreter and with Haines. Indeed,

Haines and Sly began to observe visits from a separate room in order to keep child interacting with father.

Meanwhile, child has been with the same foster family since October 2004. The foster mother has a Latino father but speaks only a very little Spanish. Child is bonded with the family, and his foster parents wish to adopt him. Because he is in the critical early years of his development, he has a strong need to form lasting permanent attachments in the near term. Child finds chaotic environments difficult and needs structure. He also is very aware of and adapts to the emotions of those around him.

Child is thriving with the foster family. Sly observed that, when child first came into care, as a result of his very early experiences, he was more cautious and less outgoing than average. Child has made significant progress, going from being lethargic and unresponsive to being more secure and able to connect with others. Child's foster family has provided him with a lot of interaction and stimulation. According to an evaluation by an early intervention program, child is developmentally on track. Sly credited the quality of his foster care with helping child become more secure.

Child is very active. By the time of trial, he was able to climb out of his crib in the night and had learned to open child safety latches on doorknobs. Child likes to try to climb on things and to grab things. According to his foster mother, he is "into everything" and requires constant, close supervision.

Despite his recent move to a larger apartment in mother's apartment complex, father testified at trial that, if child were returned to him, he would move out of that apartment building and end his relationship with mother. He claimed that he and mother had stopped dating two months before trial so that he could get custody of child and that, since mother had decided to relinquish her parental rights, he and mother were just friends.

However, father and mother have a history—admitted by mother and confirmed by other witnesses—of falsely denying that they were a couple. At the time of trial, they continued to have contact several times a week. Father's

employer understood that mother was father's girlfriend and that father was "trying to get things together" for child and mother. Mother testified that she and father were not in an intimate relationship but were "still kind of romantically involved." Although mother asserted that she did not feel afraid of father, she still felt that he controlled her and treated her like a piece of property.

At trial, father admitted past violence against mother but minimized that conduct. For example, he acknowledged biting mother on the face but claimed that he "thought we were playing around." He admitted pushing mother while she was pregnant but said that he did not recall hitting her in the stomach. Likewise, he admitted pushing mother while she was holding child but testified that he did not recall hitting her.

Father's account of how he would avoid violence in the future was not particularly reassuring. He testified that he learned from the Crossroads program "not to fight; but I fought [in April 2006] because I was really angry and I could not stop [myself]. I didn't think at that moment to fight or not; it's just something that actually just happened." Father justified his behavior as an effort to keep mother from having contact with Kutsch and her boyfriend because he believed that they used drugs and that mother used drugs with them. When asked to explain why he would have better control over his behavior in the future, father answered, "Well, I'm gonna control everything. And if I have to take some more classes to control them, I'll take the classes. I'm gonna handle everything."

The experts who testified at trial offered a contrary view. Father's drug and alcohol counselor explained that, although alcohol abuse increases the risk of violence, treating alcohol abuse will not necessarily end any problems related to domestic violence. Nor does completion of an intervention program guarantee that someone will stop being violent. Chapin, the director of the Crossroads program, explained that people who are required to engage in a structured domestic violence prevention education program often "will diminish those physical kinds of controlling behaviors. But if they haven't dealt with the belief systems that give them the

perceived right to use those behaviors in the first place, then they will probably escalate other forms of abusive, controlling behaviors to take [their] place."

Father's relationship with mother continues to be marked by controlling behavior and violence. Gonzalez opined that such behavior by a person who has been through a domestic violence education program indicates that he did not learn or implement what he learned from the program. Here, father's conduct after completing the Crossroads program still includes domestic violence, which Chapin defined as "a group of controlling and abusive behaviors that are intended to * * * gain or maintain control of a person in a relationship who has less power than the other one." Likewise, Gonzalez testified that father's actions in preventing mother from leaving her apartment and ripping the ignition out of the car that she used were consistent with domestic violence. Gonzalez explained that for father to have custody of child while living near mother "would not be a safe situation because the child could potentially be exposed to further instances of domestic violence."

The experts and even mother and father agreed that exposure to domestic violence would be detrimental to child. Exposure to domestic violence can present a physical danger, as well as an emotional danger of trauma, depression, and anxiety. Witnessing domestic violence also creates a risk that child will himself become abusive; as Chapin explained, boys who witness domestic violence may learn "that this is how you get to treat women when they get older." Child himself could face abuse from father: Torres opined that "domestic violence is basically a reflection of [father's] capacity to contain and control his anger" and that, if father continued to be physically abusive to mother, he likely would be at least verbally abusive to child. Both parents agreed that child being around violence between them would be detrimental to child. Mother explained,

> "If we were to start arguing, or something happened—bad happened, you know, [child] would be in the middle of it—in the middle of us arguing or if we were to, like, pass a hand over by accident and [child] got in the middle of it and got hit by accident or something."

Father agreed that it was "not good for * * * child" to be around when he and mother were fighting.

Although father testified that he was ready to have custody "right now," he was unable to articulate how he would handle child's needs in various situations that are likely to arise. For example, father had no idea how he would care for child if he were jailed.[1] He did not have much of an idea about the kind of food that he would give child; he testified, "Well, if I had him I would find out—find out what kind of food I could get for him. I—that's why I would need the help." When asked about setting an example for child regarding domestic violence, father answered, "I wouldn't teach him that. First, I would teach [him] the things he shouldn't do. If he sees me doing it, yes, he's gonna do it. But if I have him, I'm gonna have to teach him that that's wrong." When asked why that promise should be given credence, father blamed mother for his prior conduct. In his view, he tried to keep mother from "going out with the wrong person, doing drugs" when her conduct would affect visits with child, but mother "would shout about this, and she would run me out of the house, basically."

The juvenile court found father unfit because, among other things, he exposed child to domestic violence, failed to learn sufficient parenting skills to provide for safe and proper care for child, and failed to effect a lasting adjustment sufficient to enable child's safe return.[2] In a detailed opinion, the court found that the relationship between father and mother persists and that father had been "disingenuous in representing himself to the court" and had attempted to hide the relationship. The violence in the relationship remained unresolved and "presents a safety threat to the child. If, as [father] contends, mother has a drug problem, the

[1] The possibility of father being jailed is real. For example, during the week before trial, father was arrested on a warrant for a probation violation relating to his failure to pay a fine associated with a driving while under the influence of intoxicants (DUII) conviction, and he spent a night in jail. Father had DUII convictions in 1999 and 2003. He also had prior convictions for driving while suspended, but he continued to drive without a valid driver's license, even during the termination trial.

[2] The juvenile court also found father unfit on the basis of neglect. DHS concedes that it did not prove that basis for termination under ORS 419B.506. *See State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 787-89, 126 P3d 758 (2006).

level of conflict is likely to remain." Although father's home was otherwise adequate, the

> "stability of the home is doubtful because of the turbulent and conflicted relationship between mother and father. If the child were to be placed in father's care, it is highly probable [that] mother would be an aspect of the household or a caregiver. Mother's cognitive deficits and lack of parenting skills and perhaps more importantly her lack of interest in parenting would not make this a stable living situation for [child]. Again mother's potential use of drugs would further amplify this instability."

As to father's parenting skills, during visitation, father did not demonstrate understanding of safety threats to child and had difficulty maintaining positive contact with child. Ultimately, the court determined that father would be ready for child's return but for his ongoing relationship with mother and his lack of parenting skills. Although father was offered appropriate services for a significant period of time, the trial court found that he failed to address problems related to his relationship with mother and domestic violence.

On appeal, father argues that his conduct has not been detrimental to child, that child could be reintegrated into his home within a reasonable time, and that termination is not in child's best interests. DHS responds that father's conduct, especially as it relates to mother, is seriously detrimental to child; that father is unlikely to be able to provide a safe home for child within a reasonable time; and that termination and adoption are in child's best interests. Although father made commendable progress by attaining sobriety and despite his compliance with other services provided to him, we agree with DHS that father continues to engage in conduct that is detrimental to child and is unlikely to change within a reasonable time, and we conclude that termination of father's parental rights is in child's best interests.

■■ ORS 419B.504 establishes the framework for termination of parental rights:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration

of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"* * * * *

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

ORS 419B.504 requires a two-step analysis. First, the court must examine whether the parent has engaged in conduct or is characterized by a condition and whether the conduct or condition is seriously detrimental to the child. Second, if the parent is unfit, the court must determine whether it is improbable that the child will, within a reasonable time, be integrated into the parent's home. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). ORS 419B.504 assumes that a parent who was unfit can change, and termination is merited only if the parent is presently unfit. *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 448, 134 P3d 940 (2006).

■      Facts supporting termination must be proved by clear and convincing evidence, which is evidence that makes the asserted facts highly probable. ORS 419B.521(1); *State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 48, 144 P3d 943 (2006). In assessing a parent's fitness, we view all proven conduct or conditions in combination. *Id.* at 49.

■      Here, we conclude that father has failed to effect a lasting adjustment in his conduct—specifically, his destructive relationship with mother, characterized by his domestic violence, and his practice of unsafe parenting skills—after extensive efforts by DHS over a two-year period. As to the domestic violence, father emphasizes that all but one of the incidents of physical violence occurred before he attained sobriety; he also stresses the "mixed signals" that mother

gave him about whether she wanted to end their relationship. However, the evidence is clear and convincing that father physically assaulted mother, as well as a friend who tried to help mother, *after* he attained sobriety and completed a domestic violence prevention program. Moreover, as established by unrebutted expert testimony, father's ongoing pattern of entering mother's home against her wishes and attempting to control her behavior is closely linked to his physical violence toward her. That pattern continued at the time of trial, well after father had completed services and after he had repeatedly been told that his relationship with mother was a significant obstacle to his gaining custody of child.

Although father denied having an ongoing relationship with mother, the juvenile court found that his testimony was not credible, and we give considerable weight to that credibility determination. The record strongly supports the conclusion that father had not been honest about the relationship, that father and mother were still involved with each other, and that they would continue to be so. When we consider whether father can adequately care for child, the pertinent conduct does not depend on whether mother wished to end that relationship. Whether mother felt conflicted or father felt confused about the relationship is not our concern. Rather, we are concerned with father's conduct of continuing a relationship marked by his violence and controlling behavior. Over a two-year period during which DHS made reasonable efforts, father failed to adjust that behavior.

As to his conduct related to parenting skills, father contends that he made efforts to improve his skills and that, based on Sly's observations, as of 2006 his skills no longer presented safety concerns for child. Although father apparently made some efforts and improved in some regards, we conclude that his parenting skills remained inadequate to keep child safe. Although Sly's concerns did shift over time from father's inability to meet safety needs to his inability to meet developmental needs, Sly never thought that father was ready even to have unsupervised visits, let alone to be a full-time single parent. Meanwhile, Haines consistently observed father having problems with keeping child safe from risks such as choking hazards. She testified that she

typically had to redirect father concerning safety issues twice per visit. After two years during which child was in foster care and father was receiving hands-on parenting training, father still had not assimilated fundamental lessons needed to keep child safe from choking hazards for even four hours per week.

Although perfection in parenting is not required, father's skills fall too far short. Given that child is very active and requires close supervision, father's ability to protect child in his home is doubtful when father has difficulty keeping child safe within the structured environment of a supervised visit room. After two years, father was unable to effect sufficient improvements in his parenting skills to be ready for unsupervised visits. He has not effected adjustments in his parenting skills needed for child safely to return home, nor does it appear likely that he can do so.

We next consider whether that conduct is seriously detrimental to child. Father argues that child has suffered no detriment from his conduct and is healthy and well-adjusted. We conclude, however, that father's conduct is seriously detrimental to child. As explained in expert testimony and as at least partially recognized by both parents, father's violence toward mother presents serious physical and emotional risks to child. Although child has done well in foster care, where he is protected from the relationship between father and mother, he was lethargic and not open to connections with other people when he was first taken into protective custody. If child were returned to father, he would likely be exposed to further domestic violence between father and mother, and emotional and physical harm would ensue. In addition, father's failure to learn parenting skills would expose child, an active little boy who needs close supervision, to choking and other hazards. The detriment is particularly apparent when father's conduct is viewed as a whole—that is, when we consider that father has trouble meeting child's needs even in a structured environment and that the relationship between father and mother is marked not by structure but by violence and trespass. Child's current healthy condition is a function of his placement with others, not evidence that father's conduct is safe for child. Rather, father's conduct is seriously detrimental to child.

■ We next consider whether it is improbable that child can, within a reasonable time, be integrated into father's home. In father's view, child could be returned to him within a reasonable time; father testified that his relationship with mother would not continue and that he was prepared to take care of child. Father's testimony about his relationship with mother, however, was not credible, given the evidence regarding their relationship at the time of trial. Given father's failure to effect changes in the conduct discussed above, it is not probable that child can safely be returned to him within a time that is reasonable in light of child's need for permanency. *See* ORS 419A.004(20) (defining "reasonable time" as "a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments").

Although father was provided services to address problems with domestic violence and his parenting skills, he did not adjust his behavior sufficiently after receiving services. A parent's attendance at classes without a change in behavior is not enough to establish that a child can be safely returned home. *State ex rel Dept. of Human Services v. Rodgers*, 204 Or App 198, 221-22, 129 P3d 243 (2006). Here, by the time of trial, two years after child entered foster care, father still had not made substantial progress in avoiding violence and controlling behavior toward mother, instead minimizing his behavior and blaming mother for provoking him. His continued conduct toward mother indicated that he had not internalized the information he was taught in domestic violence prevention education. Likewise, despite the assistance that he obtained during his supervised visits with child, he had not made sufficient progress in developing safe parenting skills to become a minimally adequate parent, but rather required continued assistance and supervision in keeping child safe even in a controlled setting. Although father made commendable progress by overcoming his alcohol abuse, he did not display similar progress in other areas necessary for safe parenting, nor did the services provided appear to be helping him progress further at the time of trial.

■ We therefore consider whether termination of father's parental rights is in child's best interests. ORS 419B.500. Father contends that he and child have a good

relationship.[3] Although father and child love each other, the bond between them is not strong. By contrast, child is very attached to his foster parents, who have provided him with excellent care. Given child's need for permanency and the improbability that father can offer him a safe home within a reasonable time, termination of father's parental rights is in child's best interests.

Affirmed.

---

[3] Father's argument that child would suffer by not knowing family members in Mexico is unpersuasive, given that father never told them of child's existence. Although father claimed that he would do so if child were returned, that claim finds no support in his actions, including his silence during the first months of child's life.