Argued and submitted November 18, 2008, affirmed February 25, 2009

In the Matter of L. J. B. and D. E. M. B.,
Minor Children.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

M. B.,
*Appellant.*

Jackson County Circuit Court
060532J, 060533J;
Petition Numbers 060532JA, 060533JA;
A139288 (Control)

In the Matter of M. R. B.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

M. B.,
*Appellant.*

Jackson County Circuit Court
060534J;
Petition Number 060534JA;
A139289

203 P3d 258

Ann Lechman-Su argued the cause for appellant. With her on the brief was Johnson & Lechman-Su, PC.

Katherine H. Waldo, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

**ORTEGA, J.**

Mother appeals after the juvenile court established a guardianship under ORS 419B.366 for her three youngest children. Father did not contest the guardianship. On *de novo* review, ORS 419A.200(6)(b), we conclude that unresolved problems with domestic violence prevent the safe return of the children to mother within a reasonable time and that guardianship is in the children's best interests. Accordingly, we affirm.

The juvenile court took judicial notice "of all orders and the file." Accordingly, we take the facts from those materials, as well as from the transcript of the guardianship hearing and the exhibits offered at that hearing.

By the time of the hearing, the Department of Human Services (DHS) had been involved with mother off and on for 10 years. An earlier case involved mother's two oldest children—B, born in 1997, and R, born in 1999. Since August 2006, B and R have been in a private guardianship with the same relatives who are the proposed guardians for the children in this case. The guardianship of B and R is not at issue here.

In 2000 and 2001, mother was referred to domestic violence programs and medication management; father was referred to anger management, stress management, and domestic violence programs. Mother and father also were referred to couples and individual counseling, parenting classes, and psychological evaluations. Mother and father successfully completed services at that time.

The three children whose guardianship is at issue are eight-year-old M, four-year-old D, and three-year-old L. In August 2006, after DHS had received seven referrals regarding the family, the children were taken into protective custody. Mother admitted that she had failed to supervise M and L and that she had a history of mental health problems; father admitted having "a history of assaultive behavior." Despite the previous domestic violence programs, father was again accused of assaulting mother, and M reported that she had seen father hit mother in the face and that there was blood everywhere after the assault.

Both parents were offered services: parenting classes and domestic violence programs for both parents and individual counseling and medication management for mother. From August to December 2006, mother and father engaged in services and were doing well. In December, the children were returned.

The return was of short duration, however. The following April, mother told a DHS caseworker, Weiss, that she was having difficulty handling the two youngest children while recuperating from knee surgery. Mother asked if the two youngest could briefly stay with mother's cousin and his wife (now the proposed guardians). DHS investigated, found the proposed guardians to be a very suitable placement, and approved the requested visit.

Shortly thereafter, DHS removed M and placed all three children with the proposed guardians, following a report that M, then age six, "was scared at home with her parents, that they had been fighting a lot, that there were objects being thrown against the walls." When Weiss interviewed M about the referral, M said that mother and father fought every night and that "[s]he would come out of her room and beg them to stop * * * and they would tell her to go back into her room and shut the door; and it would continue." After Weiss interviewed M, mother called Weiss to report that, on medical advice, "she had gone off her [psychotropic] medication. It was a mistake. She didn't share all the information with the doctor. She went on and on and on— basically excuses and reasons of why [M] should not be removed." As a result of going off her medication, mother had a bipolar episode. Mother later told Weiss that she was again stabilized on her medications.

At the time the children were removed, father already had completed his most recent domestic violence course, and mother completed hers the following month (May 2007). Mother and father also were in parenting classes, which they completed in August, receiving a positive evaluation. They attended a session of couples counseling, and mother had been "on and off seeing a counselor" individually. The domestic violence classes and parenting classes instruct participants not to engage in fighting and throwing things,

the type of conduct that M reported was ongoing at the time of removal.

After the April removal, mother was given a service agreement requiring her to engage in individual and couples counseling, which she did. Similarly, father was to engage in individual and couples counseling and parenting classes.

In July, DHS received another report of domestic violence between mother and father. Soon thereafter, mother called Weiss and reported the incident herself, stating that she was no longer with father and that he had moved out. A few days later, mother told Weiss that father had taken everything, that "she did not have money to eat and that she had been drinking lately." She reported that she had called a counseling service and was "having another assessment."

As a result of the July incident of domestic violence, DHS decided to move for guardianship for the children. Weiss believed that, despite the ample services that mother and father had received, their pattern of domestic violence continued.

The following month, in August 2007, the juvenile court approved implementation of the concurrent plan of guardianship. A month later, mother and father moved to Arizona, where they remained at least through the guardianship hearing. As Weiss explained to mother, DHS had resources to assist mother in Oregon, but not in Arizona. The action agreement between DHS and mother required mother to engage in couples counseling and individual counseling, but because of a lack of financial resources, she did not engage in those services after moving to Arizona.

Mother did comply with the action agreement's provision for twice-weekly telephone visits. M told one of her proposed guardians that she enjoys visiting with mother and father by phone but does not have much to say to them and that

> "she is kind of worried, because they don't like it when she calls [the proposed guardians] Mom and Dad, so she doesn't like to talk to [her parents] very much, because she is afraid that she will call [the proposed guardians] Mom and Dad and that they will be angry with her."

A few months after moving to Arizona, mother had a 90-minute in-person visit with the children. Although the children looked forward to it, the visit was somewhat awkward because the children had not seen mother in so long. Nevertheless, despite deterioration of the parent-child bond, the children still had a bond with mother and father.

The hearing on DHS's motion for guardianship was held at the end of May 2008. At the time, M, D, and L had been in foster care with the proposed guardians for a little over a year, and they had been in an earlier out-of-home placement from August to December 2006. The children were doing well, and the proposed guardians were willing and able to meet the children's needs and to be their guardians.

Noting that the children have been in foster care "for a period of time in which termination of parental rights would be mandatory unless compelling reasons were found otherwise,"[1] the juvenile court concluded that the children could not safely return to mother and father within a reasonable time. The court concluded that, although mother and father had been offered and had completed services, they had not made lasting changes, as illustrated by the incident of domestic violence in July 2007.

The facts supporting a guardianship must be established by a preponderance of the evidence. ORS 419B.366(2). ORS 419B.366(5) provides:

"If the court has approved a plan of guardianship under ORS 419B.476, the court may grant the motion for guardianship if the court determines, after a hearing, that:

---

[1] ORS 419B.498(1) provides, in part:

"Except as provided in subsection (2) of this section, the Department of Human Services shall simultaneously file a petition to terminate the parental rights of a child or ward's parents and identify, recruit, process and approve a qualified family for adoption if the child or ward is in the custody of the department and:

"(a) The child or ward has been in substitute care under the responsibility of the department for 15 months of the most recent 22 months[.]"

One of the exceptions to the requirement for filing a termination petition is that "[t]here is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward." ORS 419B.498(2)(b).

"(a)   The ward cannot safely return to a parent within a reasonable time;

"(b)   Adoption is not an appropriate plan for the ward;

"(c)   The proposed guardian is suitable to meet the needs of the ward and is willing to accept the duties and authority of a guardian; and

"(d)   Guardianship is in the ward's best interests. In determining whether guardianship is in the ward's best interests, the court shall consider the ward's wishes."[2]

A reasonable time is "a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20).

On appeal, mother contends that the juvenile court erred in finding that the children could not be returned to her within a reasonable time and that guardianship was in the children's best interests. She points out that she had success-fully completed multiple services. She argues that the inci-dents in April and July 2007, although not appropriate, were not severe and that there is no evidence of further domestic violence in her relationship with father. In mother's view, the children could be returned to her immediately.

We begin by considering whether the children can safely return to mother's care within a reasonable time. At the time of the guardianship hearing, mother was still in a relationship with father, despite his history of assaultive behavior. Mother and father had received domestic violence prevention services and participated in parenting classes more than once over the course of DHS's 10-year involvement

---

[2] Those statutory standards differ from the standards for termination of paren-tal rights. Under ORS 419B.504, for example, parental rights may be terminated if "the parent or parents are unfit by reason of conduct or condition seriously detri-mental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or condi-tions not likely to change." That statute requires an assessment of the parent's present fitness; only if the parent is unfit may the court proceed to consider whether the child may be returned to the parent within a reasonable time. *State ex rel Dept. of Human Services v. Rardin*, 340 Or 436, 447, 134 P3d 940 (2006).

In contrast to a guardianship under ORS 419B.366, the grounds for a *perma-nent* guardianship are the same as those for termination of parental rights. ORS 419B.365(2).

with the family. Nevertheless, when the children were removed in April 2007, the parent's relationship still involved frequent fighting that continued even when M begged them to stop. An incident of violence occurred in July 2007, after both parents had completed their most recent domestic violence classes. Although mother briefly separated from father after that incident, she apparently reunited with him soon after. In September 2007, the couple moved to Arizona together despite the fact that DHS could not provide services there, and mother engaged in no further services. Given the long history of problems that have continued despite both parents' participation in services, and given mother's lack of engagement in services for most of the year that her young children have been living with the proposed guardians, we conclude that the threat of domestic violence prevents the children's safe return to mother within a reasonable time. *See State ex rel Dept. of Human Services v. V. G. B. R.*, 216 Or App 282, 299, 172 P3d 286 (2007), *rev den*, 344 Or 280 (2008) (concluding, in a termination of parental rights case, that the child's safe return to the father within a reasonable time was improbable where, after receiving services to address domestic violence issues, the father had not made substantial progress in avoiding violence and related behaviors).

We also conclude that the guardianship is in the children's best interests. The children are doing well with the proposed guardians, who provide them with a safe home.

Affirmed.