Argued and submitted December 11, 2003, reversed and remanded with instructions to enter judgment terminating mother's parental rights March 10, petition for review denied June 15, 2004 (337 Or 160)

In the Matter of
S and R, Minor Children.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Appellant,*

*v.*

Sarah PAYNE,
*Respondent.*

01-619J and 01-620J; A121954

86 P3d 87

Michael C. Livingston, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

George W. Kelly argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Schuman and Ortega, Judges.

SCHUMAN, J.

## SCHUMAN, J.

The state appeals the denial of its petition to terminate mother's parental rights after she failed to end her relationship with her husband, who sexually abused one of her children. We review the record *de novo*, ORS 419A.200(6)(b), "giving considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990). Fully recognizing both the classical conflict of loyalty facing mother in this case and the draconian sanctions visited on her for resolving it as she did, we nonetheless conclude that the trial court erred in not terminating her parental rights.

■ ■ The governing legal standards are not in dispute. "The permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants." *State v. Jamison*, 251 Or 114, 117, 444 P2d 15, 444 P2d 1005 (1968). For that reason, and in compliance with the United States Constitution, the Oregon legislature has imposed stringent requirements that the state must meet before it completely and irrevocably severs the relationship between parent and child. ORS 419B.498 - 419B.530. In the present case, where the state has alleged unfitness, ORS 419B.504,[1] those requirements obligate the state to prove the following facts: First, at the time of the termination hearing, mother suffered from a mental condition rendering her incapable of properly caring for child for extended periods of time, had failed to make a lasting adjustment to her conduct so as to make it possible for child safely to live with her, or both; second, mother's condition and conduct are unlikely to change so as to allow reintegration of child into her home within a reasonable time; third, mother's condition or conduct is seriously detrimental to her children; and fourth, termination of mother's parental rights is in the best interest of the children. *Id.*; *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). Merely proving that mother is

---

[1] The state can also terminate a parent's rights for extreme conduct, ORS 419B.502; neglect, ORS 419B.506; or abandonment, ORS 419B.508.

presently unfit or that terminating her parental rights serves the child's best interest does not suffice. *Stillman*, 333 Or at 145-46; *State ex rel SOSCF v. Hammons*, 170 Or App 287, 297, 12 P3d 983 (2000), *rev den*, 331 Or 583 (2001). Further, the state has the burden of proving all of the facts by clear and convincing evidence. ORS 419B.521(1); *Santosky v. Kramer*, 455 US 745, 747, 102 S Ct 1388, 71 L Ed 2d 599 (1982). Evidence of a fact is "clear and convincing" if it makes the existence of the fact "highly probable." *State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000). Put another way, evidence is clear and convincing if it is "of 'extraordinary persuasiveness.' " *State v. Simon*, 180 Or App 255, 263, 42 P3d 374 (2002) (citing *State v. Johnson*, 131 Or App 561, 564, 886 P2d 42 (1994)).

We apply these legal precepts to the following facts, which we find on *de novo* review of the record. Mother was raised in Springfield, graduated from high school in Salem, and attended community college for a year and a half. At the time the termination hearing began, she was 27 years old, sharing a house with her mother in Eugene, and employed as a shift leader in a fast food restaurant. Her nine-year-old son, S, had been born in 1994 when mother was 17 and living in California. His biological father, not a party in this case, subjected mother to physical and emotional abuse; for that reason and because of his increasing involvement with drugs, she left him within a year of S's birth and moved back to Oregon.

There, she began a relationship with another man whom the record identifies only as "Terrence." He was also a drug user with a propensity toward domestic violence; during that relationship, she began to use drugs herself. One day in 1999, while on an errand to Portland to purchase drugs, she failed to pick up S at his day care. He was taken into protective custody and placed in emergency shelter care. After approximately two weeks, he was returned to mother's physical custody. He remained a ward of the court for another eight months, until November 1999, at which time the court, on the recommendation of the Department of Human Services (DHS),[2] terminated the wardship. According to mother,

---

[2] DHS was formerly known as CSD, SOSCF, and SCF. We use the most recent name throughout.

that episode caused her to stop using drugs. The state does not allege, and no evidence would suggest, that she has used drugs or alcohol since 1999.

At around the same time that S was first put in shelter care, and shortly after mother left Terrence, she met Demetrus Payne. Within two months, she married him, knowing that his parental rights in two of his children, aged three and four, had been terminated due to allegations that he sexually abused them. The marriage occurred in February 2000. The family moved into quarters consisting of two connected rooms in a motel in Cottage Grove. In May 2001, mother and Payne's daughter R was born.

Meanwhile, S was having problems at school and at home. He was hyperactive, aggressive, and disobedient to such a degree that he was referred for counseling at The Child Center in Eugene. On November 21, 2001, S, then eight years old, disclosed to the counseling staff that Payne had been sexually abusing him for several months. The disclosure occurred at a meeting where S, mother, Payne and a social services worker were present. Mother appeared to be surprised by the disclosure, but S claimed he had already told her about a recent incident of abuse. According to the social worker, S "said [at the meeting] that he and [Payne] were laying on the bed, in one of the bedrooms, and that [Payne] had his hand on his pee-pee and that he, [S], was yelling to his mother, who was in the other room, make him stop, make him stop and his mother said—told [Payne] to knock it off, that it was inappropriate." At subsequent interviews out of the presence of mother and Payne, S also told DHS workers that S had touched Payne's penis, and that Payne had touched S's penis, ejaculated on him, and anally penetrated him. S told the workers that he was afraid of Payne and talked about physical abuse suffered by mother and perhaps by S himself at the hands of a previous boyfriend, presumably Terrence. DHS workers immediately placed S in protective custody.

A DHS specialist met with mother and Payne on November 26, 2001, five days after S's disclosure, for a safety plan meeting. Mother appeared "befuddled" when directly confronted with the allegations of sexual abuse, stating that

she loved both her son and her husband. Payne, for his part, denied the allegations. The DHS specialist nonetheless clearly told Payne and mother that Payne had to stay away from the family so that mother could retain physical custody of their daughter, R. Both parties agreed. However, another DHS employee called mother two days later and heard Payne's voice in the background. Although mother claimed he was at the motel only to remove his belongings, DHS told mother to bring R to a DHS office, where the girl was immediately taken into protective custody. The DHS specialist spoke with mother later that day. Mother was noncommittal about separating from Payne and expressed her belief that S, in accusing Payne, was confused from his medications or from a similar incident that might have occurred earlier with Terrence. Mother has subsequently acknowledged that Payne did, in fact, sexually abuse S, although nothing in the record indicates that charges have been filed against him.

On December 19, 2001, Daeschner, the social worker assigned to mother's case, met with mother, who told her that, because of her religious beliefs—she characterizes herself as a "born-again Christian"—she had no intention of dissolving her marriage to Payne. Daeschner reiterated that mother could not live with Payne if she wanted to have custody of her children. Shortly thereafter, Payne moved out. Mother became homeless and began living with her mother in a van. Despite Daeschner's repeated warnings to stay away from Payne, Daeschner reported seeing Payne in the van on January 14, 2002.

In February 2002, mother and Payne met with Daeschner to draw up a plan for returning S and R to mother's custody. Mother agreed to undergo a complete psychological evaluation and a drug and alcohol assessment, to obtain individual counseling, and to attend supervised visits with her children. She also agreed to separate from Payne and not to live with him. Within two weeks of that meeting, DHS decided to file a termination petition, although the petition itself was not filed until May 23, 2002.

Between the time the abuse was reported and the termination hearing began, mother acquired housing and regular employment. She was seen with Payne on several

occasions despite having been warned that contact with him would jeopardize her ability to retain custody. As noted above, he appeared not to have moved out of the motel in a timely fashion, and he was seen in mother's van on at least one occasion. After the petition was filed, a DHS worker saw mother and Payne attending church together. Another DHS worker saw them together at a Wal-Mart in July 2002. No reports, however, indicate that they lived together after Payne moved out of the motel.

Also between the reported abuse and the hearing, mother underwent several mental health assessments. The first was conducted by Dr. Sweet on January 23, 2002. At the time of Sweet's assessment, mother was still living in a car with grandmother and had not yet entered into the service agreement with DHS. Based on background material supplied by DHS, a one-hour interview, and results from several psychological and intelligence tests, Sweet submitted a written report concluding that, because of her "defensive manner" and desire "to make herself appear in a favorable light," her "profile is of questionable validity." He also concluded that it was "difficult to provide a clear diagnosis for this woman." Nonetheless, he diagnosed her as having an "Adjustment Disorder with Mixed Anxiety and Depressive Mood," "Borderline Intellectual Functioning," and a "Personality Disorder, N[ot] O[therwise] S[pecified], with characteristics of dependent and passive-aggressive personality disorders." According to the report, mother had no present drug problem and had the ability to find and retain employment.

On March 7, 2002, Mother attended a mental health assessment with Nicole Ivey. During the session, mother told Ivey three times that she was attending the assessment only because of Daeschner's repeated requests. Mother stated "she was not interested in obtaining therapy services at this time, and that she has 'more than adequate supports in place in my life from my friends, family, church and religious beliefs to more than adequately address the stress' she currently is experiencing in her life." Ivey concluded that she did not have enough information to indicate whether mother needed mental health treatment.

On March 15, 2002, mother attended the requisite drug and alcohol assessment. The evaluator determined that mother was not an appropriate candidate for drug and alcohol treatment, as there had been no substance abuse since March 1999. The evaluator noted that mother could benefit from a "women's issues group," but mother declined to participate because "she already has a supportive social network in place that is meeting her needs." However, from September to December 2002, mother did attend a nonoffending parents' group, where she participated actively in discussions about the safety and other needs of abused children.

The termination hearing began on February 13, 2003. The state presented several witnesses who testified to their concerns about mother's ability to provide a safe environment for R and S. Sweet, based again on his one-hour interview and review of tests he earlier found to be "of questionable validity," nonetheless expressed concern about mother's ability to keep her children safe because she seemed to focus too much on her relationships with men and making sure her own dependency needs were met. He believed that, although someone with mother's borderline mental functioning and personality disorders can be an adequate parent, the children remained at risk as long as Payne remained in contact with the family. He also stated that, if mother were able to secure a stable residence (which she had by that time), it would improve his opinion of her ability to parent. Jana Hazelton, a mental health consultant who supervised mother's visits with children from May 2002 to January 2003, testified that she was concerned that mother would be unable to set boundaries if further contact with Payne were to take place.

At the end of the day's testimony and before mother put on any witnesses, the court called counsel for mother, DHS, and the children into his chambers. When they emerged, the state announced that it agreed to a 120-day continuance and to provide mother with individual counseling, while mother agreed to undergo the counseling, to file a petition for separation or dissolution of her marriage, to allow DHS to "drop by her home and check on her on occasion," and

"to have absolutely zero contact" with Payne. The court elaborated on this last requirement in the following colloquy with mother:

"THE COURT: * * * All right. She is to have absolutely zero contact with him. I mean, no contact. That's personal, phone, in writing, email, no other way except through the courts as is necessary to finalize the separation and is necessary to determine any rights that he may or may not have towards their joint youngster. And that's the child [R].

"And that starts right now. Right now. This minute. The only contact she can have with him from this point forward is goodbye.

"Do you understand that, Ms. Payne?

"MS. PAYNE: Yes, your Honor.

"THE COURT: I mean, I'm very serious about that. You are going to lose these children if you have any contact with him. He is totally inappropriate for these children, and this is the end of the line. This is your last chance.

"You are going to be required to have absolutely no contact with him. He's gone. He's out of your life. He's out of your life forever. Right now.

"And secondly, whatever these people tell you to do regarding counseling, you will do it, and you will do it immediately when they tell you to do that. Do you understand that?

"MS. PAYNE: Yes, your Honor, I do.

"THE COURT: If you don't do both of those two things, you have literally no chance of remaining the mother of these children. Do you understand me now?

"MS. PAYNE: Yes, I do.

"THE COURT: This court is giving you one last chance to do these things. * * * Do you understand me?

"MS. PAYNE: (Nods)

"* * * * *

"THE COURT: All right. Mr. Johnson[, your counsel,] is going to tell you that there is one thing about me: When I

lay down rules, there is no deviation from them. I have zero tolerance. If you don't do exactly what I tell you to do, that's the end of the line. Okay?

"MS. PAYNE:   Okay."

As required by the court, mother attended individual therapy from February 25, 2003, until the court reconvened. During this time, mother also regularly participated in a domestic violence group. The state's investigator conducted surveillance on mother on 30 to 40 occasions; he reported seeing her and her mother leaving the vicinity of Payne's home once, but he reported no other contact. Mother filed for dissolution of her marriage on May 20. Mother and grandmother both reported that neither had any contact with Payne other than what was necessary to serve him with divorce papers.

The second part of the termination hearing took place on May 22, 2003, and it appeared to go badly for mother. Her individual counselor, Wichmann, testified that she did not believe that mother was capable of making a choice between S and Payne, that mother had not accepted any responsibility for the abuse of S, and that she could not make the connection between the abuse and S's behavior problems. Wichmann was particularly concerned that mother and grandmother appeared to blame mother's older sister for the sexual abuse inflicted on the sister by mother's father; Wichmann feared that mother would similarly blame S, and not Payne, for the abuse S had suffered. Wichmann did not make any diagnostic conclusions but reported that mother would need 12 to 24 months of additional therapy before she could adequately understand the impact of the abuse.

Most disturbing, however, was clear and convincing evidence that, despite the unequivocal warnings and despite her claims to the contrary—including claims to Wichmann, her therapist—mother had been in frequent contact with Payne during the 120-day continuance. Although one of mother's witnesses presented credible alibi evidence that she was at work when the state's investigator allegedly saw her and grandmother near Payne's house, neither mother (who

did not testify at either hearing) nor anybody else satisfactorily explained telephone records showing that, between the two hearings, more than 107 phone calls totaling more than 11 and a half hours were exchanged between mother's home phone and Payne's cellular phone. On appeal, mother argues that many of the calls occurred during her working hours. However, except with respect to one day, the record contains no evidence of what mother's work schedule was, and the calls occurred on every day of the week and at all hours. Grandmother testified that all of the calls were between Payne and her and that mother did not know about any of them, but the trial court found grandmother's testimony not to be credible, and we agree. It is inconsistent with uncontradicted evidence that she told a DHS worker, before the telephone records came to light, that she had had no contact with Payne. Further, her claim that mother did not know about the calls cannot be reconciled with the fact that she and mother shared very cramped quarters. Thus, the *only* evidence that nearly 12 hours of telephone calls between Payne's phone and mother's house were not, in fact, between Payne and mother was grandmother's testimony, which was self-contradictory and far-fetched. We therefore find as fact that at least a significant number of the calls were between Payne and mother.

The trial court, as noted above, also expressed serious misgivings about the telephone calls. It called grandmother's story incredible and, before taking the case under advisement, told the parties, "[T]his phone stuff really, really bothers me." Children's lawyer, acknowledging that S wanted to resume living with mother, nonetheless concluded that, because of the phone calls, he had to recommend termination. Six days later, however, the court entered an Opinion and Judgment concluding that the state had not sufficiently proved its case. Although the court agreed that "[t]here probably has been some contact with Mr. Payne," it concluded:

"The mother is not a perfect parent and needs to seek knowledge on parenting and the selection of partners. However, there has developed an adversarial relationship between the agency and the mother which has contributed

significantly to mother not being totally successful in therapy. The demeanor of the State's witnesses demonstrated to this Court that the agency or its consultants have done little or nothing to alleviate mother's fears from her perception of this adversarial situation. Much of the State's case is based on their speculation and not on the facts.

"The Court cannot conclude that the State has proven by clear and convincing evidence that mother is an unfit parent or that the children cannot be safely integrated into the mother's home."

The court denied and dismissed the state's petition to terminate mother's parental rights.

■     ˙   As the trial court emphasized at the close of the hearing—and as the state appeared to agree—the central and controlling issue in this case is whether mother can protect her children from Payne in particular and from abusive partners in general. In other words, nothing in the record suggests that mother is not intelligent enough to raise children, that she does not relate to them appropriately at visits with them, that she has a substance abuse problem, or that she will not provide them with adequate housing and nutrition. If she has a mental condition that renders her unfit, it does so not because she falls neatly into some official category of disability that is *per se* incapacitating, but only insofar as it might account for her pattern of relationships and support a prediction that the pattern is entrenched.

We also agree with the trial court that, by the time of the hearings, the relationship between DHS and mother had long since turned adversarial. We are not convinced, however that the existence of an adversarial relationship is a significant factor in determining mother's fitness in this case. Once DHS petitions for termination, its relationship with a parent will necessarily be adversarial; any services the agency provides or requires thereafter, including therapy, will necessarily occur in an adversarial context, and for the agency to encourage the parent to think otherwise would be dishonest. Thus, the fact that an adversarial relationship colors the parent's ability to benefit from services cannot by itself defeat the agency's ability in the proper case to proceed to termination.

Further, we acknowledge that the state's case involves speculation. However, in any termination case under ORS 419B.504, the state must prove that "integration of the child into the home of the parent or parents is improbable within a reasonable time." That proof requires a prediction about the future, and it is necessarily speculative.

In fact, we find ample undisputed historical facts amounting to clear and convincing proof that mother is unwilling or unable to recognize that she or Payne has any responsibility for the abuse of S or to take the steps necessary to keep her children safe from Payne. As noted above, both of the mental health professionals who addressed the issue, Sweet and Wichmann, reached that conclusion, noting mother's tendency to minimize her and Payne's culpability and the damage inflicted by the abuse. In isolation, these opinions—each based on one interview and the unexplained results of standardized tests—would not persuade us to sever mother permanently from her children. Before taking such a drastic step, we need more than hastily conceived impressionistic adjectives like "dependent" and "passive-aggressive" that, after all, apply to many adequate parents, and we need more than conclusory "diagnoses" like "personality disorder, not otherwise specified" and "adjustment disorder," even though they are listed in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed 1994) (DSM-IV).[3] The evaluations, however, reinforce the inferences we draw from mother's actions. She originally lost physical custody of R because she did not follow orders to keep Payne out of her house, and then she maintained telephone contact with him after the court told her in no uncertain terms that doing so would cost her the children. The psychological evaluations in combination with the historical record allow only one finding: Mother, for reasons we can never know, lacks either the will or the ability to end her relationship with the man who

---

[3] Disorders listed in DSM-IV include such "diagnoses" as "Caffeine-Induced Sleep Disorder." *Id.* at 604. We do not mean to imply that DSM-IV is not a useful tool. *See, e.g.,* OAR 859-010-0005(4), (5) (adopting DSM-IV for use by Psychiatric Security Review Board). Our point is that announcing a person has a "disorder" listed in DSM-IV, without further explanation of what the disorder is and how it might render a person an unfit parent, is not helpful, much less dispositive, in termination cases.

abused her child, even when she knows that she cannot have both that relationship and her parental rights.

From this single fact flow the answers to the questions that the law requires us to confront in reaching a termination decision. First, by maintaining contact with the abuser, mother, at the time of the hearing, had failed to adjust her conduct so as to make it possible for her children safely to live with her. Second, the predictions of mental health professionals, as well as our own judgment based on mother's history, establish that this conduct is not likely to change so as to allow reintegration of the children into her home within a reasonable time. Third, mother's conduct has caused serious detriment to S. At the time he reported the abuse, he showed hyperactivity, aggression, and unsafe behavior. He was diagnosed with post-traumatic stress disorder, attention deficit disorder, and "attachment issues." After a period of isolation from mother and, consequently, from fear of being near Payne, he showed marked improvement. According to his therapist, "[h]is safety level has improved tremendously. His success at school has been dramatic. He's more compliant, more responsive to direction, and keeping his body safe." His ability to focus improved, as did his grooming and self-esteem. These facts provide ample support for the conclusion that mother's choice of partners has inflicted serious detriment on S.

And while we have no basis for determining whether mother's choice of partners, inability to protect S from abuse, and unwillingness to sever contact with Payne have already inflicted detriment on the infant R, we need not await the event in order to conclude that harm is imminent enough to justify termination. ORS 419B.504 requires the state to prove mother "unfit by reason of conduct or condition seriously detrimental to the child." That requirement does not specify that the serious detriment must already have occurred as a prerequisite to termination. A condition or conduct can be called "detrimental" based on potential harm even before that harm comes to pass: a tumor, for example, is detrimental even when it is microscopic and undetected. *Stillman*, which merely restates the statutory term, is not to the contrary. 333 Or at 145 ("The court must find that * * *

the conduct or condition is 'seriously detrimental' to the child."); *see also* ORS 419B.504(2) (termination court can consider "[c]onduct toward any child of an abusive, cruel or sexual nature"); *State ex rel Juv. Dept. v. Nguyen*, 182 Or App 294, 48 P3d 864 (2002), *aff'd in relevant part*, 335 Or 255, 66 P3d 1025 (2003) (termination of parental rights in two children, only one of whom had suffered actual abuse).

Finally, we conclude that the best interests of R and S are served by allowing them to grow up in a home where they are safe from sexual abuse and from the reasonable fear of sexual abuse. That is not mother's home.

Reversed and remanded with instructions to enter judgment terminating mother's parental rights.