260 P.3d 821 (2011)
245 Or. App. 81
In the Matter of H.C., aka H.S.F. C.-M., a Child.
DEPARTMENT OF HUMAN SERVICES, Petitioner-Respondent,
v.
A.M.C., Appellant.
0900121; Petition Number 10JU126TPR; A147480.
Court of Appeals of Oregon.
Argued and Submitted May 24, 2011.
Decided August 17, 2011.
*822 James A. Palmer, argued the cause and filed the brief for appellant.
Samuel A. Kubernick, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.
Before SCHUMAN, Presiding Judge, and WOLLHEIM, Judge, and NAKAMOTO, Judge.
SCHUMAN, P.J.
Mother appeals from a judgment terminating her parental rights to her daughter, H. We agree with the juvenile court that, at the time of the termination trial, mother was not fit to assume the responsibilities involved in parenting H; mother as much as concedes that fact. However, we also conclude that DHS did not adduce clear and convincing evidence that mother's unfitness is or would be seriously detrimental to H, that it would persist so as to make integration into mother's home within a reasonable period of time improbable, or that termination is in H's best interest. We therefore reverse.
The facts are not in dispute. DHS argues, and mother concedes, that, until the time of her most recent incarceration, mother abused drugs, committed crimes, and failed every attempt to reform. Twenty-five years old at the time of the hearing, she began using drugs at age nine. She has used marijuana, heroin, alcohol, cocaine, methamphetamine, LSD, hallucinogenic mushrooms, and "ecstasy." Most recently, her drugs of choice were prescription opiates, marijuana, and methamphetamine. She has been involved with DHS at least since 2004, when she tested positive for drug usage during her pregnancy with S, her first child. In 2006, after DHS filed a petition for custody of S, mother relinquished her parental rights to her, and she was adopted by mother's parents.
Mother's second child, H, who is the child involved in this termination proceeding, was born in 2007 and was removed from mother's care in March 2009 after mother's third child, I, was born prematurely in February 2009 with drugs in his system. At that time, mother admitted that she was addicted to Percocet and Vicodin. All three of the children are now living with mother's parents, who have expressed an interest in adopting H should mother's parental rights be terminated.
Mother has a history of failing in drug treatment programs. She began an inpatient treatment program in March 2009, but was ejected when she was found with a syringe and opiates in her possession. After that, she entered an outpatient treatment program pending another residential placement. She continued to use drugs, however, and to commit crimes to support her habit. She was taken into custody in April 2009 after pleading guilty to multiple theft offenses and held in Douglas County until May 26, 2009, when she was released to an inpatient treatment facility. Mother completed treatment there with "satisfactory progress" and a good prognosis, but remained drug-free for only three months. In January 2010, she entered yet another residential treatment program, where she stayed only a short time. After mother admitted to drug use, the court revoked her probation on earlier charges and sentenced her to six months in the custody of Douglas County Corrections.
After a temporary release to have kidney stone surgery, mother returned to jail in Douglas County and began participating in "drug court." She was released from custody on July 16, 2010, but continued her participation in drug court. After being evicted from a shelter for missing a scheduled chore, mother (with the approval of her probation officer) found housing with her Narcotics Anonymous and Alcoholics Anonymous sponsor. At the time of the termination trial, mother was still living with her sponsor. She had been drug free since her incarceration and for the six weeks thereafter.
Mother has had two psychological evaluations by Dr. Ewell, a clinical psychologist. In 2005, Ewell diagnosed her as having a *823 personality disorder, "not otherwise specified," with borderline and antisocial features; major depressive disorder; post-traumatic stress disorder; and polysubstance dependence in remission by self-report. The psychologist noted that mother would be a "dual diagnosis" client and that the existence of the personality disorder coupled with drug use greatly complicated treatment. He concluded that mother's prognosis was "poor."
In 2009, after the birth of I, mother was again examined by Ewell, who made similar diagnoses. He observed that mother expressed some limited insight into the needs of her children, but he expressed the opinion that it would take a minimum of 12 months for her to complete all of the programs needed for successful interventions so that she could parent. Ewell agreed that if mother was abusing drugs at the time of his evaluations, the diagnoses could have been a reflection of the drug use and not an underlying psychological problem.
Between the start of her participation in drug court and the time of trial, mother had taken 14 random drug and alcohol tests, all of which were negative. She was voluntarily attending at least twice as many Narcotics Anonymous meetings as are required. She continued to be an active participant in drug court, recognizing her addiction, becoming more accountable for her actions, and taking responsibility. Mother's drug addiction counselor testified at the hearing that she did not currently see signs of depression or the personality disorders identified by Ewell, and expressed the view that those diagnoses might have reflected the effects of the drug addiction. In light of the positive changes in mother's behavior since she began participation in drug court, the counselor was optimistic for mother's recovery. Her probation officer testified that, since mother's release from custody, she has been an "outstanding" and motivated participant in drug court. DHS acknowledges her progress.
Mother concedes that she has had a long history of drug abuse, addiction, relapse, and crime to support her drug habits. She testified, however, that since her recent incarceration and participation in drug court, she has made a 180-degree turn-around in her life. She has become involved with the recovery community and is looking into returning to school and finding grants for school and housing. She visits regularly with her children. She acknowledges that she is at risk of relapse and intends to keep attending NA and AA meetings. She also acknowledges that, at the time of trial, she was not prepared to be the custodial parent for H; rather, she testified that in three or four months it would be time to evaluate whether she is able to care for H and that, in the meantime, she wants to take parenting classes, obtain housing, and go back to school or find work before having custody of the children. Ideally, she would prefer a year of sobriety before resuming custody.
The juvenile court wrote a thoughtful and complete opinion explaining its decision to terminate mother's parental rights to H. The court did not make any determination of credibility, but it is clear that, in light of mother's long history of abuse, failed treatments, and relapses, the court was skeptical of mother's ability to maintain her recovery. The court also was concerned about the mental health issues that had been identified by Ewell in his evaluations of 2005 and 2009. The court determined that mother's drug usage and criminal conduct made it reasonable to conclude that she could not adequately care for herself or the children and that there had been serious detriment to the children. The court further determined that integration of H into mother's home was improbable within a reasonable time because of conduct or conditions that are not likely to change:
"As of the first day of trial, Mother had been clean and sober for 46 days, discounting any time that she was in a restricted environment, and while her progress should be acknowledged, it is only a small fraction of the 16 years that she abused drugs. Dr. Ewell testified that it could be a year before we would know if Mother has the ability to maintain her sobrietyroughly a third of [H's] life to date. Given the probability that Mother will relapse, it is unreasonable for [H] to wait for such an unlikely event."
*824 Finally, the court determined that it was in H's "best interests to terminate the parental rights of her mother in order to continue the stability of the warm and nurturing environment with her maternal grandparents."
On appeal, mother asserts that, although she is not currently prepared to assume the role of a custodial parent to H, she is not for that reason an unfit parent, that her conduct or condition has not been detrimental to H, and that it is not in H's best interests to terminate mother's parental rights.
The state concedes that no harm has befallen H, but asserts that harm is imminent if and when mother relapses and that, in light of mother's lengthy history of drug abuse, relapses, and crime, a relapse is inevitable. The state points out that, at the time of the termination hearing, mother had been out of custody for only six weeks and that she lacks experience as a parent.
ORS 419B.504 requires a termination of parental rights upon a finding that
"the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."
In State ex rel. SOSCF v. Stillman, 333 Or. 135, 145-46, 36 P.3d 490 (2001), the Supreme Court set out the proper sequence of analysis under that statute:
"ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Secondand only if the parent has met the foregoing criteriathe court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home `within a reasonable time.'"
Using this template, we conclude that the termination judgment must be reversed.
We agree that the evidence supports the finding that mother (1) "has engaged in some conduct" that could, and in many instances would, (2) be "seriously detrimental" to a child. We are less certain about mother's "condition," that is, her alleged personality disorder; although Ewell twice made that diagnosis, he also testified that the condition might be tied to drug use and not psychopathology. In any event, however, we are unable on this record to agree that clear and convincing evidence supports the remaining criteria. Regarding the question whether mother's conduct or condition has been "seriously detrimental" to H, the trial court explained its finding as follows:
"[H] was born September 10, 2007, and was placed in substitute care on March 5, 2009, with her maternal grandparents, * * * the adoptive parents of her sister, [S]. The evidence at trial did not focus on [H]; therefore, the conditions of her. childhood while in the care of Mother are largely unknown. [H's grandmother] did testify that Mother had `used more (drugs) than she should during [H's] pregnancy; however, she had a `healthy pregnancy' and [H] was a `happy, healthy baby.' Apparently, at least for a time, Mother and [H] resided in a trailer on the maternal grandparents' property, and according to [a] DHS caseworker, [H] spent a significant amount of time with the [grandparents] prior to the placement in March of 2009. Although there is less evidence concerning Mother's drug use in 2007, it is clear that, by [I's] birth in February of 2009, Mother's drug use was out of control. Therefore, it is reasonable to conclude that in March of 2009, when [H] was placed in substitute care, Mother could not adequately care for herselfmuch less [H] *825 and her newborn brother. The serious detriment to the children speaks for itself."

(Emphasis added.) With respect, we disagree. The court in Stillman makes it clear a parent's condition, even if reprehensible or pathological, does not justify termination of parental rights unless the conduct or condition is seriously detrimental to the child. The conduct or condition, in other words, does not speak for itself. In the present case, there is no evidence, much less clear and convincing evidence, that mother's conduct or condition has been, or will be, seriously detrimental to H. H was born healthy, and remains happy and healthy. DHS itself, in its brief on appeal, recognizes this fact:
"DHS acknowledges that the record indicates that [H] is `doing well,' and the evidence does not establish that she currently has any emotional or physical difficulties or other special needs. Nevertheless, the requirement of serious detriment `does not specify that the serious detriment must already have occurred as a prerequisite to termination. A condition or conduct can be "detrimental" based on potential harm even before that harm comes to pass.' * * *
"Here, [H] likely has suffered serious detriment due to mother's drug use, criminal conduct, and resulting absence from a large part of her life."
DHS correctly understands that termination can be based on a parent's conduct or condition that is only potentially detrimental, but the potential must be proven by clear and convincing evidence. Unspecified detriment that we can only discern because the evidence of conduct or condition "speaks for itself," is a far cry from actual, clear, and convincing evidence that proves serious detriment.
We also conclude that DHS has failed to prove, by clear and convincing evidence, that H's integration into mother's home was improbable within a "reasonable time." As for what the record shows concerning the length of time anticipated for success, by mother's own testimony, assuming that she is able to stay sober, it will be at least a year before she is able to parent. Mother's current living situation is only temporary. She is unemployed. She needs time to focus on her recovery and could relapse. She lacks parenting experienceindeed, she has never parented her children in a "clean and sober" state. There is evidence that addressing mother's mental health treatment needs could consume up to 18 months. The state contends that that is too long and that mother's track record makes it improbable that she will continue in her recovery. However, despite a very poor history, which mother acknowledges, in light of mother's genuine, indeed dramatic, shift in attitude and conduct and her expressed desire and motivation to continue her recovery, we decline to determine at this time that mother's problems are intractable.
Under ORS 419B.504, a "reasonable time" is a period "that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). That definition requires a child-specific inquiry and testimony in psychological and developmental terms regarding what the particular child requires. Stillman, 333 Or. at 146, 36 P.3d 490. Whether the child can be integrated into the parent's home within a reasonable time is measured by the child's needs. H has been in foster care with her grandparents for at least half of her life, and they were her primary care providers before that. She is well bonded to them and well cared for, healthy and happy, and her mother is still in her life. This is hardly a situation where the child is "languish[ing] in foster care," as the state contends. The grandparents have adopted S and are interested in adopting H if mother's parental rights are terminated. Ewell testified in general about the consequences to a child of temporary and substitute care, and that it "often causes children to develop senses of insecurity, of anxiety, confusion." However, there is no evidence specifically addressing H's need for permanency or whether it would be reasonable for her to wait a year to 18 months pending determination of mother's ability to sustain her recovery. Especially in light of the facts that H is living with her grandparents and siblings and the grandparents have indicated that they want to adopt her should *826 mother's parental rights be terminated, and given the lack of specific evidence regarding H's needs, we conclude that the record falls short of the clear and convincing evidence that must be adduced before we will terminate a person's parental rights.
Judgment terminating mother's parental rights reversed and remanded.