In the Matter of
E. T. M., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. M. M.,
*Appellant.*

Marion County Circuit Court
J090522;
Petition Number 111510MIL1;
A149164

279 P3d 306

Margaret McWilliams argued the cause and filed the brief for appellant.

Shannon Terry Reel, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Mother appeals a judgment terminating her parental rights to her son, E, on grounds of unfitness, ORS 419B.504. E was removed from both parents' custody when he was five months old because his older half-brothers, B and T, sustained nonaccidental injuries while under E's father's supervision.[1] Both parents denied that the injuries were the result of abuse, but father later pleaded guilty to criminal mistreatment of T and was sentenced to 31 months' imprisonment, with a projected release date in April 2012. Meanwhile, mother participated in parenting training and mental health counseling and underwent a psychological evaluation. Throughout the course of the involvement of the Department of Human Services (DHS), mother continued to believe, and to express, that father did not abuse the children. While father was in prison, mother violated a no-contact order by corresponding with him using a pseudonym. Eventually, DHS petitioned to terminate both parents' rights to E.

After a termination trial, the juvenile court granted DHS's petition to terminate mother's parental rights to E and entered a judgment to that effect. Mother appeals, contending that (1) no conduct or condition that was seriously detrimental to E existed at the time of trial; (2) the juvenile court deprived mother of constitutionally adequate notice when it found unfitness based on conduct or a condition that was not alleged in the termination petition; and (3) the juvenile court erroneously concluded that E's best interests were served by terminating mother's parental rights. Although mother's interactions with E in most ways indicated that she was a minimally adequate parent, her failure to effect a lasting adjustment to recognize the risk that father posed to E and to place E's needs above her own places E at risk of harm and is seriously detrimental. Further, mother's mental condition caused her inability to recognize father as a safety risk and made it unlikely that mother's conduct or condition will

---

[1] Father's parental rights to E were also terminated as a result of the termination trial that preceded the judgment on appeal in this case. Father has not appealed the judgment terminating his parental rights. Mother's parental rights to B and T are the subject of a separate proceeding.

change to allow E's reintegration into her home within a reasonable time. Accordingly, we affirm.

## I. FACTS

We state the facts as we find them. ORS 19.415(3)(a) (appeals in termination of parental rights cases are reviewed *de novo*). We begin with an overview of events that precipitated DHS's involvement with the family before discussing father's background, mother's participation in services, her mental health, and E's status at the time of the termination trial.

### A. *Background*

Mother and father married in 2002. Both have prior involvement with DHS. Mother's four oldest children were removed from her custody in the early 2000s and are in guardianship with mother's mother. Father's parental rights to a daughter were terminated in 2003. He also has an extensive criminal history, including convictions for four counts of first-degree attempted assault in 2003 following his attempt to run over four police officers with his car. He also has convictions for second-degree attempted kidnapping, unlawful use of a weapon, DUII, and two convictions for "felony elude." While father was in prison from 2003 to 2006, mother gave birth to B and T. Mother and father reunited upon his release in 2006 and lived together with B and T.

### B. *DHS involvement*

E was born in February 2009 and lived with mother, father, and his half-brothers B and T. In August 2009, when E was five months old, law enforcement was contacted when B, then age four, and T, then age three, were observed at a Department of Motor Vehicles office with extensive bruising. A subsequent DHS investigation revealed that B had a large, deep bruise on his upper back and neck, smaller bruises near his eyes, leg, and buttocks, and a "v-shaped" scar on his lower back. T had bruises around his eye and on his left ear, buttocks, legs, chest, and forehead. E exhibited no injuries.

During the initial investigation, father explained that B had bruised his back when he fell off a play structure and landed on a concrete wall. Mother stated that she was

not present when B injured his back but that father and B had informed her that a fall had caused the injury. The investigating police officer, after examining the play structure, the concrete wall, and the surrounding area, determined that B's injuries could not have been sustained from a fall of the type that father described.

As to the other injuries that B and T had sustained, mother and father offered explanations for some but could not explain others. Both parents acknowledged that father spanked T and that he played "rough" with the boys and suggested that some of the injuries could have resulted from spanking or "rough play," but not from any form of abuse. Mother suggested that the injury to T's ear occurred when B "head-butted" him and that B injured his eye getting down from his highchair.

After examining B and T, the children's pediatrician, Dr. Gilbert, generally concluded that the injuries to the boys were not accidental. He noted that B's back bruise was more extensive than he would have expected from a fall like that described by father. He also opined that the extensive bruising on the underside of T's ear was inconsistent with mother's explanation that it resulted from a "head-butt" by B. Gilbert also ordered a "skeletal workup" of B and T; the results came back normal.

DHS took all three children into protective custody in August 2009, and, a few days later, the juvenile court entered a shelter order placing E in DHS's custody. That November, the juvenile court took jurisdiction over E under ORS 419B.100(1)(c) (conditions and circumstances of the children) and ORS 419B.100(1)(e) (parent's failure to provide care for the children). The court concluded that (1) mother had an unsafe partner—E's father—and that she requires services to "acquire the skills and resources necessary to assure a safe home for" E, and (2) mother failed to care for and protect E because B and T suffered injuries while in father's care and mother failed to intervene to ensure the children's safety and welfare. The court also ordered no contact between mother and father. In March 2010, E was placed in foster care with his maternal uncle and aunt and has

remained in their care; they are identified as E's adoptive resource.

In the meantime, the state pursued criminal charges against father related to the older children's injuries. In February 2010, he pleaded guilty to criminal mistreatment of T, admitting that he "caused physical injury to [T], a dependent person." Father asserted at the termination trial, however, that he took the plea deal because he did not expect to receive any prison time (he received 31 months); he continued to maintain that he did nothing wrong.

Father's prison time has been eventful. He has been subject to discipline for failure to follow orders, assault on another prisoner, and smearing fecal matter in a holding cell while awaiting a disciplinary hearing. In addition, mother, acting through a pseudonym and in violation of the no-contact order, corresponded with father by letter for four months until she was caught in September 2010. She indicated to father that she intended to "play the game" so that DHS would return the children.

Father underwent a psychological evaluation before entering prison. Dr. Cook diagnosed him with schizoaffective disorder, obsessive-compulsive disorder, personality disorder not otherwise specified with schizotypal and antisocial traits, and borderline intellectual functioning. Cook also observed some evidence of schizophrenia and major depressive disorder. Cook opined that persons with these types of disorders are difficult to help because they typically are reluctant to accept help or are paranoid about the potential malice of the person offering help. Cook concluded that father's prognosis for change and ability to benefit from treatment were quite low at the time of the evaluation.

C.  *Mother's participation in services*

DHS recommended that mother participate in parenting classes and counseling, and the juvenile court ordered mother to undergo a psychological examination. The services were designed to improve mother's parenting skills and to help her acknowledge the potential threat that father posed to the children and to improve her protective capabilities. Mother participated in a 10-week program called "Family

Building Blocks" and in in-home parent training through Options Counseling. She also was referred to a therapist for counseling beginning in February 2010. Mother met with the therapist, Irvin, 27 times between February 2010 and May 2011.

Generally, the service providers reported that mother had minimally adequate parenting skills and provided an appropriate home environment. The in-home parenting counselor testified that, during treatment in late 2010, mother demonstrated minimally adequate parenting skills and that she improved some of her skills. Mother's DHS caseworker confirmed that mother maintained an appropriate home environment and was minimally adequate during her visits with E, although the caseworker expressed some concerns about mother's ability to manage all three children at one time. However, according to the caseworker, mother continued to assert that father did not abuse the children and she did not show any improvement in her ability to protect her children. The in-home counselor also noted that mother continued to deny the possibility that father was "unsafe."

Irvin, mother's mental health therapist, opined that mother's therapy was generally ineffective. During therapy, mother never waivered from her belief that father did not harm B and T, and she failed to exhibit much empathy toward her children. She expressed to Irvin that she did not understand how father could be a danger to her children and that she continued to believe that father would not harm them. Thus, Irvin also concluded that mother's protective capabilities had not improved through therapy.

D.  *Mother's mental health*

Cook performed a psychological evaluation of mother in January 2010. He diagnosed her with depressive disorder not otherwise specified, amphetamine abuse reportedly in remission, and a personality disorder not otherwise specified with histrionic, dependent, and narcissistic features. At trial, he opined that a personality disorder with the traits exhibited by mother was highly concerning in light of mother's situation. He explained that such traits result in

methods of functioning, thinking, feeling, and relating to others and self in habitual and maladaptive ways. According to Cook, a histrionic subject tends to be emotionally flighty and shallow and to have superficial relationships, and often lives vicariously through another person. Cook also opined that people with dependent personality features feel incomplete if not in an "attachment relationship." Narcissistic individuals have difficulty seeing things from any perspective other than their own and prioritize their own needs above the needs of others.

Cook asserted that, from his observations, mother does not see the world as most people would. Rather, she is highly resistant to admitting certain things even in the face of contrary evidence. Mother professed her belief that father was innocent and was being framed, and Cook left with the impression that she was more concerned with defending father than with regaining custody of E, B, and T.

Cook concluded that mother was dependent on father and had great difficulty separating from him. He noted that her coping strategies—minimalization, denial, and suppression of stressors—are unhealthy and place her at risk of being dependent on men who have an abusive component to their personality. Further, he stated that her "propensity for remaining in a violent relationship must be considered a long-standing risk factor." He concluded that he would have significant concerns if E were returned to her care because he "saw her as being more committed to the relationship and getting her needs met through the relationship than in addressing the specific needs of her children for safety, stability, protection, *et cetera*."

Cook opined in his written report at the time of evaluation that, as a "best-case scenario," if mother acknowledged her shortcomings as a parent, worked diligently to learn more effective parenting methods, and left father or became "forcefully assertive" with him, she could be able to independently parent B, T, and E in 12 to 24 months. At the termination trial, Cook noted that, based on his observations, mother would continue to have "great difficulty separating herself from" father and that the best case scenario had not

taken place. Cook explained that his prognosis for change was "highly guarded."

E.  *Mother's testimony at the termination trial*

Mother testified at the termination trial that father did not abuse B and T. She offered explanations for the various injuries that were generally, but not entirely, consistent with the explanations that she gave during the initial investigation. She minimized B's and T's injuries, explaining that the pictures introduced into evidence made the injuries look worse than they really were. She testified that father's past criminal behavior did not concern her because he is sober and his past behavior occurred while he was using drugs. She also professed that she was not troubled by the results of father's psychological evaluation, although she was concerned that father was getting into trouble in prison. Mother explained that her past statements that she would not leave father were a result of DHS continually informing her that the children would not be returned to her "no matter what." When asked if she was "currently willing to stay separate, live separately" from father, mother answered, "Yes." She also claimed that she had never filed for divorce from father because she believed that the children would never be returned to her, so it would have been pointless. In addition, she "wasn't going to pay for" the divorce: "if DHS wanted me to get the divorce, then they can pay for it."

As for her participation in services, mother testified that, although she completed services requested by DHS, she did not need mental health therapy or parenting classes. According to mother, none of the services helped her or changed her parenting style.

F.  *E's status at the time of trial*

At the time of trial, E was in foster care with his maternal aunt and uncle. He was attached and bonded to his foster parents, and they supported his participation in necessary services. E's physical development is normal, but his development of motor skills and expressive speech is slightly delayed. His current caregivers are prepared to adopt him, allowing him to retain contact with his extended family. At the time of trial, E was also bonded to mother.

## II. ANALYSIS

The juvenile court terminated mother's parental rights for unfitness. ORS 419B.504. Accordingly, the state has the burden of proving, by clear and convincing evidence, that mother is unfit because she engaged in conduct or is characterized by a condition that is seriously detrimental to the child and it is improbable that the child can be integrated into mother's home within a reasonable time because the conduct or condition is unlikely to change. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). The fitness of the parent is measured at the time of the termination trial, *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006), and the focus of the test is "on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Stillman*, 333 Or at 146.

On appeal, mother raises three assignments of error. First, she challenges the juvenile court's determination of unfitness. Second, she contends that the court violated her right to constitutionally adequate notice of the claims against her because one of the bases of the court's unfitness determination was not adequately alleged in the termination petition. Third, mother argues that it is not in E's best interests to terminate her parental rights. We address mother's unfitness before briefly addressing the best interests of E. We do not reach mother's second assignment of error because we ultimately conclude that other grounds of unfitness alleged by DHS support termination of mother's parental rights.[2]

### A. *Conduct or condition seriously detrimental to child*

Mother contends that DHS failed to prove by clear and convincing evidence that she was unfit at the time of trial. First, she asserts that DHS failed to prove conduct or a condition that is seriously detrimental to E. She explains that

---

[2] Specifically, mother assigns error to the juvenile court's determination that mother's mental condition prevented her from creating a viable plan for the return of E. Mother argues that DHS did not include that allegation in the petition to terminate mother's parental rights. We need not address mother's second assignment of error because, independent of whether mother was capable of creating a viable plan, there is clear and convincing evidence of mother's unfitness.

the evidence at trial established that she has minimally adequate parenting skills; further, mother contends that she has addressed DHS's primary concern about returning E to her care because she has expressed a willingness to separate from father and obtain a divorce from him if necessary. She also asserts that, to the extent that her condition is characterized by mental illness, the record does not establish that she is unable to care for E because of that mental illness. Mother maintains that Cook's evaluation, at most, demonstrated that her mental condition makes it more difficult for mother to separate from father and recognize the risk of harm that he posed to E. Nevertheless, she points out that Cook concluded that mother may be capable of parenting E if she completes mental health counseling and parenting services, as she has indeed done; she notes that she made progress during her participation in those services and that she stopped communicating with father by September 2010.

Mother also asserts that any harm to E was not seriously detrimental. First, she maintains that DHS failed to link mother's conduct or condition to any serious detriment to E because there was no nexus between the mental health issues identified by Cook and mother's ability to parent. Mother also argues that, because at the time of trial father was not scheduled to be released from prison until April 2012, any likelihood of harm to E was too speculative.

DHS counters that this case turns on mother's inability to put E's needs ahead of her relationship with father despite overwhelming evidence that father abused B and T. DHS asserts that the evidence demonstrates that mother, despite participation in services, continues to prioritize that relationship over E's safety and that she is therefore unfit. DHS also explains that mother's personality disorder blurs her understanding of reality, which explains her failure to recognize that father's behavior was inappropriate and that he continues to pose a risk to E. Given mother's mental condition and her inability to separate from father, DHS asserts that E is at risk of harm.

Based on the evidence adduced at trial, we agree that the state proved mother's unfitness by clear and convincing evidence. We consider all proven conduct or conditions in combination when evaluating a parent's unfitness.

*State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 456, 180 P3d 69, *rev den*, 344 Or 670 (2008). The concern throughout this case has been that father presented a safety risk to E, as evidenced by his prior abuse of E's half-brothers, and that mother's failure to recognize or acknowledge that risk placed E at a serious risk of harm. DHS recommended services that were intended to help mother to recognize and acknowledge that risk, so that she could learn to keep E safe from father.

The evidence at trial established that mother failed to adjust her circumstances and condition to make E's return possible because, despite overwhelming evidence that father abused B and T and despite the services provided by DHS, mother remained unable or unwilling to end her relationship with father. Although mother testified at trial that she was willing to separate from father, the overwhelming weight of the evidence indicated otherwise. Throughout the course of DHS's involvement, including at the termination trial, mother continued to express her belief to everyone that father was not a danger to her children. Despite a no-contact order, mother secretly continued to communicate with father for several months while he was in prison. In those communications, she indicated that she would "play the game" so that DHS would return the children. Mother refused to acknowledge that father's mental condition might pose any risk to E, and she refused to take any legal action to separate from father. She blames DHS for her situation and has not presented credible evidence of any improvement in her willingness or ability to protect E from father upon his release from prison.

Further, that conduct or condition, particularly when considered in light of mother's mental condition, is unlikely to change; thus, it is improbable that E can be integrated into mother's home within a reasonable time. Mother's participation in services has, by all accounts, failed to alleviate the safety risk to E that is central to this case. Mother has expressed her continued belief that services were unnecessary and unhelpful. Her service providers confirmed that mother failed to effect a lasting adjustment to recognize and address the risk that father poses to E. Moreover, although mother's mental condition may not by itself be

enough to support a finding of unfitness, it supports the conclusion that her conduct or condition is unlikely to change. Cook noted that mother's primary coping mechanisms of "minimalization, denial, and suppression of stressors" place E at risk of serious harm because mother has not demonstrated a willingness to place E's needs ahead of her own. Her mental health diagnosis also established that she is at high risk of remaining in violent relationships to E's potential detriment. Cook also observed at trial that mother continued to exhibit the same behavior and denial that he had first observed during her psychological evaluation. That is, her "best-case" scenario, as outlined by Cook, had not occurred.

Mother's conduct or conditions are seriously detrimental to E. Mother contends that E, at the time of trial, was friendly, well adjusted, and did not have special medical or mental health needs. She further asserts that there is no evidence that E was harmed or suffered detriment because of mother's conduct or conditions. We disagree.

As an initial matter, E's wellness at the time of trial, almost two years after he was removed from mother's care, does not preclude a determination of serious detriment. We have consistently held that a parent's "unwavering allegiance" to another unfit parent and failure to keep a child away from the unfit parent, even when that decision means that a child will be taken from the parent's care, is seriously detrimental to the child. *State ex rel Dept. of Human Services v. J. A. C.*, 216 Or App 268, 279, 172 P3d 295 (2007); *State ex rel Dept. of Human Services v. V. G. B. R.*, 216 Or App 282, 297, 172 P3d 286 (2007), *rev den*, 344 Or 280 (2008); *State ex rel DHS v. Payne*, 192 Or App 470, 482, 86 P3d 87, *rev den*, 337 Or 160 (2004). Here, father abused B and T and poses a serious potential risk to E. Mother has demonstrated an "unwavering allegiance" to father and has not shown a willingness to keep E away from him, even though failing to do so means E will remain out of her care.

We also conclude that father's imprisonment at the time of trial does not alter our conclusion that mother's conduct or condition is seriously detrimental to E. It is well established that conduct or a condition can be seriously detrimental based on the potential for harm. *Payne*, 192 Or App

at 483; *see also Dept. of Human Services v. A. M. C.*, 245 Or App 81, 89, 260 P3d 821 (2011). That is, we do not need to await the harmful event to conclude that harm is imminent enough to justify termination. *Payne*, 192 Or App at 483. Father, at the time of trial in June 2011, was to be released from prison, at most, within 10 months. In the circumstances of this case, where the evidence established that mother showed no inclination to separate from father or to keep E safe from father and her mental condition made it unlikely that she would do so, we have no difficulty concluding that father's expected return into mother's life 10 months from the termination trial is imminent harm that justifies a determination of unfitness.

B.  *Best interests*

Finally, we conclude that termination of mother's parental rights is in E's best interests. He was removed from mother's care at the age of five months. He has been living with his potential adoptive resource—his aunt and uncle— since March 2010. He is bonded to his aunt and uncle and, if adopted, will remain in touch with his extended family. As we have recognized time and time again, " '[a]t some point, the child's needs for permanence and stability in life must prevail.' " *State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 58, 144 P3d 943 (2006) (quoting *State ex rel SOSCF v. Lehtonen*, 172 Or App 584, 594, 20 P3d 310, *rev den*, 333 Or 73 (2001)). E's aunt and uncle can provide stability and permanence; mother has not demonstrated that she can provide a home safe from the risks that father poses. Accordingly, termination of parental rights is in E's best interests.

Affirmed.